**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SHELDA NETTLES-PIERCE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 05 C 4267** |
| **v.** | ) | **Mag. Judge Michael T. Mason** |
| | ) | |
| **JOANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Shelda Nettles-Pierce ("Nettles-Pierce" or "Claimant") has brought a motion for summary judgment seeking judicial review of the defendant's, Commissioner of Social Security, ("Commissioner") final decision. The Commissioner denied Nettles-Pierce's claim for Supplemental Security Income Benefits ("SSI") under the Social Security Act ("Act"), 42 U.S.C. §§ 416(I) and 423. The Commissioner filed a cross motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ"). Nettles-Pierce also filed a motion for remand pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of new evidence. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the following reasons, Nettles-Pierce's motion for summary judgment is granted in part and denied in part. The Commissioner's motion for summary judgment and Nettles-Pierce's motion for remand pursuant to sentence six of 42 U.S.C. § 405(g) are denied. This case is remanded for

1

further proceedings consistent with this opinion.

**PROCEDURAL HISTORY**

Nettles-Pierce filed an application for SSI on January 10, 2002. (R. 55-57). Her application and subsequent request for reconsideration were both denied. (R. 28-31, 33-37). Nettles-Pierce then requested and was granted a hearing on August 5, 2003 before ALJ John L. Mondi. (R. 38-39, R. 233). Nettles-Pierce and a vocational expert ("VE"), Cheryl R. Hoiseth, testified at the hearing. (R. 233). On November 26, 2003, ALJ Mondi issued a written decision denying Nettles-Pierce's request for benefits. (R. 15-23).

**Appeals Council Review**

Nettles-Pierce filed a request for review of the ALJ's decision. (R.14, 8-11). In connection with the request for review, Nettles-Pierce submitted additional evidence to the Social Security Administration's Appeals Council, which the Appeals Council considered in making its determination. (R. 5). The additional evidence included treatment records and a physical assessment by George DePhillips, M.D., dated July 7, 2004 through March 21, 2005. (R. 5, 279-290). The Appeals Council denied Nettles-Pierce's request for review. (R. 4-7). Thus, ALJ Mondi's decision became the final decision of the Commissioner. *See Zurawski v. Halter,* 245 F.3d 881,883 (7th Cir. 2001). Nettles-Pierce subsequently filed this action.

**FACTUAL BACKGROUND**

**I.    Introduction**

Nettles-Pierce was born on November 9, 1957 and was forty-six years old at the time of the administrative hearing. (R. 239). She has a GED and accounting certificate

and also attended a small amount of college. (R. 240). She has never held a job for more than a few months but has held a variety of jobs for short periods of time. (R. 240-244). Most recently, Nettles-Pierce worked part-time as a home care worker for a quadriplegic and as a grocery bagger at Cub foods. (R. 240-242). She held both jobs for five months. (*Id.*). Both jobs ended on October 1, 2001. (*Id.*). Prior to that time, Nettles-Pierce worked as a bartender at one of her girlfriend's bars and as a telemarketer. (R. 242-244). She was also briefly employed at Entenmann's bakery and Burger King. (R. 242, 244.). On January 10, 2002, Nettles-Pierce applied for SSI, alleging a disability onset date of October 1, 2001. (R. 55-57). In a Disability Report that she signed on January 22, 2002, Nettles-Pierce reported that she is limited in her ability to work because she "is easily stressed and at times feels overwhelmed" and that she is in a "constant state of depression." (R. 67, 80). In a Reconsideration Disability Report that she signed on May 14, 2002, Nettles-Pierce reported that since filing her claim, she had physical problems and that she had "more lower back arthritis, more problems walking, and need[ed] to make frequent stops." (R. 82, 87). She also reported to the Social Security Administration ("SSA") that she experiences "hemorrhages (excessive bleeding) monthly."[1] (R. 82).

## II. Medical Evidence

### A. Mental Impairments

The ALJ received medical evidence pertaining to Nettles-Pierce's mental impairments from her treating mental health professionals, Dr. Yang Chun, M.D. and Susan

---

[1] The record reflects that Nettles-Pierce experienced problems related to excess menstrual bleeding and hemorrhaging. (R. 104-106, 112, 177, 178, 180). She was diagnosed with uterine fibroids. (R. 169, 175). She had a hysterectomy on March 19, 2003 at Provena Saint Joseph Medical Center in Joliet, Illinois. (R. 104-106, 112, 169-170).

Jungels ("Jungels"), MS, LCPC, LPHA, at Will County Health Department, Division of Mental Health; a state examining psychologist, Dr. John R. Brauer, Psy.D.; and two Illinois Disability Determination Service ("DDS") mental health professionals, Dr. Donald Henson, Ph.D, and Dr. Myrna Capati, M.D.

### 1. Dr. Yang Chun, M.D. and Susan Jungels, MS, LCPC, LPHA, Treating Mental Health Professionals

On January 23, 2002, Jungels, a licensed clinical professional counselor conducted Nettles-Pierce's initial intake evaluation and social history assessment and performed a clinical assessment of Nettles-Pierce. (R. 121, 124-132). At the initial intake evaluation, Nettles-Pierce reported symptoms of depression, agitation, and anxiousness and noted that she felt she had been depressed most of her life. (R. 121). She recalled a history of childhood abuse, a suicide attempt when she was a teenager, and an abusive marriage. (R. 121-122, 127). She reported a history of drug abuse and current alcohol dependence. (R. 121, 125). She recalled first using drugs at age sixteen and reported being a crack addict for five years but stated that she had not used drugs in two years. (R. 125). She recalled first drinking at age twelve and, since her twenties, she would drink for seven or eight hours "nonstop." (*Id.*).

In the clinical assessment, Jungels observed that Nettles-Pierce's motor activity was agitated and restless, but normal. (R.129). Her reported behaviors and attitudes were acceptable and appropriate, though impatient, guarded, and somewhat irritable. (*Id.*). Her mood was anxious, irritable, and dysphoric, and her affect was restricted. (*Id.*). Jungels opined that Nettles-Pierce's thought processes/reasoning and content were unremarkable, her concentration was focused, and there was no evidence of delusions or hallucinations,

though she demonstrated a history of poor decision making. (*Id.*). Jungels concluded that Nettles-Pierce had impairment in social, occupational, and school functioning. (R. 130). She diagnosed Nettles-Pierce with major depression, alcohol dependence, and post traumatic stress disorder. (R. 131). Her diagnostic impression indicated severe social and environmental stressors. (R. 131). She gave her a Global Assessment of Functioning ("GAF") score of 48, indicating serious symptoms.[2] (R.131).

On January 29, 2002, Dr. Chun performed a Psychiatric Evaluation, which included a mental status exam. (R. 122-123). Dr. Chun observed that Nettles-Pierce was not agitated or aggressive, but anxious. (R. 123). She was well oriented with clear, coherent speech, and there was no evidence of hallucinations or delusions. (*Id.*). Dr. Chun opined that her concentration and abstract thinking was pretty good, her insight and judgment were good, her fund of knowledge and intelligence were average, and her memory was not grossly impaired. (*Id.*). Dr. Chun diagnosed Nettles-Pierce with major depression and alcohol abuse and assessed her GAF as 55.[3] (*Id.*). Dr. Chun recommended substance abuse counseling and individual counseling. (*Id.*).

Nettles-Pierce attended a therapy session with Jungels on January 29, 2002. (R.

---

[2]The GAF score reports a "clinician's assessment of the individual's overall level of functioning." *Sims v. Barnhart,* 309 F.3d 424, 427, n.5 (7th Cir. 2002) (citing American Psychiatric Association, *Diagnostic & Statstical Manual of Mental Disorders* 30-32 (4th ed. 1994). A GAF score of 41-50 is consistent with serious symptoms or serious difficulty functioning. *See Dreyer v. Metro. Life Ins. Co.*, 459 F. Supp. 2d 675, 682 (N.D. Ill. 2006) (citing American Psychiatric Association, *Diagnostic & Statstical Manual of Mental Disorders* (4th ed. Text Revision 2000).

[3]A GAF score of 55 is consistent with moderate symptoms or moderate difficulty functioning. *See Williams v. Comm'r of Soc. Sec.*, 2007 U.S. Dist. LEXIS 60357, at *6 (S.D. Ind. 2007) (citing American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Revision 2000).

121).  Their one hour therapy session focused on current stress and coping skills, self-esteem and relationships, and how her history of sexual abuse had affected these areas of her life.  (*Id.*).  Jungels noted that Nettles-Pierce was anxious and irritable at times, but cooperative and displayed good eye contact.  (*Id.*).  Jungels completed a treatment plan, which Nettles-Pierce signed.  (*Id.*).

On February 13 and February 26, 2002, Nettles-Pierce attended therapy sessions with Jungels.  (R. 120-21).  Both sessions focused on stress and coping skills, abuse issues, and relationships.  (*Id.*).  During the February 13th session, Jungels noted that Nettles-Pierce was appropriately tearful, demonstrated good insight, but displayed a sad affect.  (R. 121).  Jungels gave Nettles-Pierce information on local Alcoholics Anonymous meetings.  (*Id.*).  At the February 26th session, Jungels reported that Nettle-Pierce's feelings were "surfacing now as she verbalized memories of abuse in her life."  (*Id.*).  Nettles-Pierce was appropriately tearful and demonstrated good insight.  (*Id.*).  Nettles-Pierce also saw Dr. Chun on February 26, 2002 and reported that she had seen a substance abuse counselor, had cut down on her alcohol consumption, and smoked only a small amount of marijuana.  (R. 119).  Dr. Chun prescribed Zoloft and gave Nettles-Pierce samples.  (*Id.*).

On February 7, 2003, Jungels noted that she had no contact with Nettles-Pierce for five months and that the case would be closed if no further contact by February 28, 2003.  (R. 193-94).  On February 27, 2003, Jungels noted that Nettles-Pierce had contacted her and that she wanted to schedule appointments with Jungels and with Dr. Chun.  (R. 193).  On March 21, 2003, Jungels noted that Nettles-Pierce had major surgery and that she would not be able to come in for six to eight weeks.  (*Id.*).

### 2. Dr. John Brauer, Psy.D, State Examining Psychologist

On February 20, 2002, John Brauer, Psy.D., a clinical psychologist, examined Nettles-Pierce for SSI. (R. 114-16). Nettles-Pierce's chief complaint was depression. (*Id.*). She stated that she had been depressed all of her life and that the degree of depression interfered with her ability to maintain employment. (*Id.*). She said that she did not have normal feelings, did not stick with things for long, starts crying for no reason, and starts screaming and hollering and becomes violent for not much reason. (*Id.*). She further reported that she cannot finish tasks and had never held a job for more than two to three months, because when the mood swings occur, she "just has to get out." (*Id.*). Nettles-Pierce stated that her feelings and behavior stem from an extensive history of childhood abuse, including sexual abuse by numerous family members and neighbors and severe physical abuse by her mother, including an incident when she was three years old where her mother held her hand in a fire. (*Id.*). She reported that in the past she had received psychiatric and anger management treatment and that she was seeing a psychiatrist, Dr. Chun. (*Id.*).

Dr. Brauer's mental status examination revealed that Nettles-Pierce was alert and fully oriented to location, identity, time, and circumstances, though her emotions fluctuated between crying and angry verbal outbursts as the discussion topic changed. (*Id.*). Dr. Brauer reported that Nettles-Pierce's speech was clear, logical, and sequential, and there was no evidence of delusion. (*Id.*). Her immediate memory was mildly impaired, her ability for abstract thought was appropriately developed and her general fund of knowledge was within normal limits. (*Id.*). Her judgment was also within normal limits, but her self-reported history suggested that this judgment eroded in the presence of intense affect. (*Id.*). Dr.

Brauer diagnosed Nettles-Pierce with Dysthymia.  (*Id.*).

### 3.      Dr. Donald Henson, Ph.D, and Dr. Myrna Capati, M.D., State Reviewing Psychologist and Doctor

On April 15, 2002, Donald Henson, a psychologist, reviewed Nettles-Pierce's records, including Dr. Brauer's consultative examinations for the Illinois DDS.  (R. 133-135, 137-150).  On June 20, 2002, Dr. Myrna Capati, MD, reviewed and confirmed Dr. Henson's evaluation.  (R. 135, 137).  Both Henson and Dr. Capati accepted Dr. Brauer's diagnosis of a Dysthymic Disorder and determined that Nettles-Pierce's symptoms "impose limitations in her ability to perform detailed activities of a complicated nature."  (*Id.*).  However, they opined that her "cognitive and attentional abilities are intact and she performs a relatively wide range of chores and leisure activities suggesting that she possesses the capability of performing simple routine activities which have few social demands."  (*Id.*).  They concluded that she would be moderately limited in the ability to carry out detailed instructions and interact appropriately with the public, but not  significantly limited in other areas of mental functioning.  (R. 133-34).  They also concluded that Nettles-Pierce had moderate restrictions in her activities of daily living and in difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, and pace, and had experienced one or two episodes of decompensation.  (R. 147).

### B.      Physical Impairments

The ALJ received evidence pertaining to Nettles-Pierce's purported back problems, including: an emergency room report; treatment records from Dr. Bender, M.D., a physician at Will-Grundy Medical Clinic; physical therapy records; and treatment records from Dr. Sullivan, a chiropractor at Will-Grundy Medical Clinic.

### 1.    Emergency Room Report

On March 26, 2002, Nettles-Pierce was treated in the emergency room of Silver Cross hospital for lower back pain.  (R. 209).  She reported pain radiating to the buttocks and noted that walking aggravated her symptoms.  (R.210).  Nettles-Pierce denied injuries and reported that the lower back pain began approximately three months prior to arrival but that she did not have a history of back pain or surgery for this condition.  (*Id.*).  An examination revealed moderate tenderness along the spine, but no spasms.  (*Id.*).  At that time, X-rays of the lumbar spine were taken, which revealed mild degenerative changes with small anterior spur formation at the level of L5-S1.  (R. 214).  She was diagnosed with back pain and sciatica.  (R. 211).   The doctor prescribed Vicoprofen for pain and Flexeril for muscle spasms.  (*Id.*).

### 2.    Dr. Frank Bender, M.D.

On May 13, 2002, Dr. Frank Bender examined Nettles-Pierce.   Nettles-Pierce reported that she had experienced back pain since she was seventeen, but that it became worse after she fell from a moving car.  (R. 158, 182).  She stated that her low back pain radiated into both legs, especially the right, and that she experienced numbness in her buttock and feet.  (*Id.*).  Dr. Bender diagnosed her with lumbar arthritis, prescribed Celebrex, an analgesic, and referred her to physical therapy.  (*Id.*).

On June 18, 2002, Nettles-Pierce requested from Dr. Bender a medical excuse for her court date on July 8, 2002, releasing her from performing 100 hours of community service, but Dr. Bender refused.  (R. 181).  On August 18, 2002, Nettles-Pierce went to Will-Grundy Medical Clinic to pick up medication and a walking cane and was put on a

waiting list to see Dr. Bender. (*Id.*). On September 10, 2002, Dr. Bender referred Nettles-Pierce to a chiropractor. (*Id.*).

### 3. Dr. Sullivan, Chiropractor, Will-Grundy Medical Clinic

On September 16, 2002, Nettles-Pierce saw Dr. Sullivan, a chiropractor at the Will-Grundy Clinic. (R. 181). At that time, Nettles-Pierce reported experiencing lower back pain since she fell on her buttock approximately eight months prior to her visit. (*Id.*). She reported recently attending physical therapy sessions for lower back dysfunction, but that appreciable decrease in symptoms did not result. (*Id.*). An examination revealed that she had decreased motion in her lower back, but she was neurologically intact. (R. 180-181). Dr. Sullivan diagnosed her with chronic lower lumbar spine and lumbo-sacral mechanical dysfunction with associated spasms and stiffness. (R. 180). He prescribed stretching exercises three times per day after a warm shower. (*Id.*).

At her second appointment on September 30, 2002, Nettles-Pierce reported that she had been completing the daily stretches and feeling an overall decrease in symptoms.[4] (R. 179). However, she related continued soreness across the top of her hips and behind both knees. (*Id.*). Dr. Sullivan observed that Nettles-Pierce was ambulating around the office with less discomfort than on her prior visit. (*Id.*). He noted a decrease in overall myo-spasm and that Nettles-Pierce seemed to be showing signs of improvement considering only two weeks of treatment. (*Id.*). He performed continued care, STM, TPT to bilateral lower spine and SI arties. (*Id.*). He instructed Nettles-Pierce to continue performing stretches two to three times per day, and he also added a hamstring stretch. (*Id.*).

---

[4]Nettles-Pierce did not attend a chiropractor appointment scheduled for September 23, 2002 due to transportation problems. ( R. 179).

At the third chiropractor session on October 7, 2002, Nettles-Pierce reported feeling better overall, despite only completing the daily stretches two days over the past week. (R. 178). She also reported being able to walk better with less reliance on her cane, but she stated that she still experiences intermittent episodes of lower back and bilateral lower extremities and aches. (*Id.*). Dr. Sullivan observed a decrease in deep and superficial myo-spasm noted on palpatory exam. (*Id.*). He observed that she was in stable condition and tolerated spinal manipulation and stretching well. (*Id.*). He instructed Nettles-Pierce to stretch two to three days per week followed by ice applications. (*Id.*). He also added an L-rotator stretch and ordered Nettles-Pierce to return the following week. (*Id.*). Nettles Pierce canceled her chiropractor report scheduled for October 14, 2002. (*Id.*).

### 4.    Physical Therapy Reports

From May 30, 2002 to June 25, 2002, Nettles-Pierce attended  seven out of twelve outpatient physical therapy sessions. (R. 230). At the initial session, Nettles-Pierce reported suffering from back pain for over five months. (*Id.*). She reported that, approximately four months prior, she jumped out of a car moving at thirty miles per hour, and she stated that she began experiencing severe pain in her lower back and buttock region approximately one and one half months later. (*Id.*). She complained of intermittent severe pain radiating across her gluteal region and sacrum into her right hip whenever she is in a weight bearing position and that her back pain became worse if she stood for more than five minutes or walked any distance. (*Id.*). She also noted that postural changes aggravated her pain. (*Id.*). She complained of numbness and other symptoms. (*Id.*).

The physical therapist observed postural deviation with a right lower thoracic and lumbar scollotic curve and marked restrictions in her active trunk movements while

standing. (R. 230-31). A neural tissue provocation test revealed a positive SLR on the left at thirty-three degrees with pain across the L-S junction into the sacrum, especially on the right, and the right SLR was fifty-eight degrees with pain around the right hip. (R. 231). Passive accessory intervertebral motion testing of the lumbar spine demonstrated tenderness with central PA's L2 through L5, greatest at L4 and L5 levels, moderate tenderness with right unilateral mobilizations at L4 and L5 level, and minimal restrictions at L3 through L5. (*Id.*). Palpation revealed minimal tenderness of the coccyx and the right superior gluteal muscles, but no trigger points were found. (Id.). The physical therapist reported that Nettles-Pierce screamed and jerked wildly when the pain occurred, observed that her subjective statements of pain were inconsistent, and noted that she might be magnifying her symptoms. (R. 231).

Physical therapy treatment consisted of: four treatments of moist hot packs with interferential current to lumbosacral paraspinals followed by myofascial release to same muscle groups and gluteals; mobilization, and positional release to correct sacral alignment dysfunction; three visits of aquatic exercise, including ambulating forward, backward, and side-stepping; AROM exercises for BLE's; heel-cord and hamstring stretching, and dangling in inner tube for long axis distraction to the lumbar spine. (R. 229). The physical therapist also showed Nettles-Pierce how to use a single point cane. (*Id.*).

In a letter to Dr. Bender dated July 25, 2002, the physical therapist reported that Nettles-Pierce had made "slow gains in physical therapy." (*Id.*). After seven visits, her pain decreased by fifty percent and her gait and posture improved. (*Id.*). She demonstrated improved activity tolerance, though she still complained of pain. (*Id.*). However, Nettles-Pierce did not achieve any of her long-term physical therapy goals due

to discontinuing attendance. (*Id.*). The physical therapist noted that Nettles-Pierce would have benefitted from further therapy to address her multiple problems in the lumbosacral region. (*Id.*).

## C.    Claimant's Testimony

Nettles-Pierce testified at the administrative hearing on August 5, 2005. (R. 239-271). Nettles-Pierce testified that a health problem that prevents her from working is her "mental state." (R. 244). She does not consider herself to be "smooth like people who come to work every day and have the same level of consistence." (Id.). She testified that she does not wake up every day "with the same consistence mentally." (*Id.*). She has "days that are more emotional than other days. [She] doesn't feel normal." (*Id.*). She stated that she does not function like other people, "because there was nothing normal about her life, and [she] kind of slipped through the cracks....and did the best [she] could with what [she] had to work with." (R. 256). She reported that she has been seeing Dr. Chun, a psychiatrist, and Jungels, a counselor, for at least one year, though has not seen the counselor recently. (R. 251, 268).

Regarding her physical impairments, Nettles-Pierce testified that the physical therapist informed her that her "spine is twisted." (Id.). She alleged back spasms and episodes during which her "back ticks out" and she has sensations that "if [she] takes another step [she] will fall." (R. 245). She testified that she cannot stand without leaning, and that she can only lean for a few minutes without her cane. (R. 247). She testified that she uses a cane everyday, which her physical therapist loaned her in June. (*Id.*). She can only walk approximately fifty feet before her legs start to bother her. (R. 246). She also testified that she lays down more often than she sits. (R. 247). She believes that she is not

supposed to lift anything, and when the ALJ asked her if she is able to lift a grocery bag with a gallon of milk, she stated that she "can feel the difference when she does it." (R. 248).

Nettles-Pierce testified that she had surgeries in January and March 2003 to correct vaginal bleeding. She testified that the surgeries helped her bleeding, but she suffers from subsequent hot flashes, which cause her to wake up every hour during the night. (R. 245, 247-248). Nettles-Pierce reported that she is taking a hormone replacement, estrogen. (R.249). She testified that she was taking Celebrex but is currently taking Vioxx for pain and is taking Celexa for her depression. (*Id.*). She is also supposed to be taking iron, but she cannot afford it. (R. 250).

Nettles-Pierce reported that she abused alcohol in the past and still "sometimes" drinks. (R. 245). She stated that sometimes she will go weeks without drinking, but "then, if its available, and [she] doesn't feel weird, then [she] will take a drink and won't stop until it is gone." (R. 245). She reported that this happens about twice a month, but she stated that drinking has not been a problem with her working.[5] (*Id.*). When she had a hangover, she still went to work. (R. 246). She testified that she smoked marijuana before but stopped some months ago. (R. 254-255).

Nettles-Pierce reported that she has resided with Jahure Wiley, a friend, since October, 2002. (R. 252). She reported that she helps with the dishes and "sometimes"

---

[5] In his decision, ALJ Mondi noted that Public Law 104-121 bars SSI benefits if alcoholism or other substance abuse is material to the inability to work. (R. 20). The ALJ did not discuss the role of alcohol and substance abuse in Nettles-Pierce's functioning since disability was not established. (R. 21). However, if on remand the claimant is found disabled by limitations from a mental impairment, the presence of the alcohol and substance abuse would require a finding on its materiality, consistent with changes to the Act by Public law 104-121.

cooks, but "does not do much of anything else." (R. 252-253). She testified that she has difficulty if she attempts to do grocery shopping on her own. (R. 253). During the day, she reads the Bible, watches television, and talks to family members on the phone. (*Id.*). She reported that she cannot drive, because her driver's license was revoked for driving under the influence, and she has not paid the $695 fine to regain her license. (R. 253-254).

## D.    Vocational Expert's Testimony

Cheryl R. Hoiseth, the vocational expert ("VE"), also testified at the administrative hearing on August 5, 2003. Based on Nettles-Pierce's testimony and the documents in the record, the VE concluded that Nettles-Pierce did not have any relevant work experience. (R. 272). The ALJ asked the VE three hypothetical questions all of which involved an individual having the same, somewhat limited work experience as Nettles-Pierce, being of her same age of forty-six years, and having the same high school equivalent education. (R. 242-243). In response to the first hypothetical question, which involved a person with an unlimited residual functional capacity physically but with the mental residual functional capacity assessed by the reviewing state physicians indicating, moderate limitations in the ability to carry out detailed instruction as well as the ability to interact appropriately with the general public, the VE concluded that examples of jobs such a person could perform included: cleaner (15,000), hand packager (14,000), and assembler (30,000). (*Id.*).

In response to the second hypothetical question as to whether the jobs would be eliminated if there was evidence also showing an exertional limitation allowing no more than light work, the VE stated that the jobs would not be eliminated, but would decrease to cleaner (6,000), handpackager (9,000) and assembler (23,000). (R. 273-274). In response to the third hypothetical question as to whether any of the jobs would be

15

precluded if the person was limited to a job of low stress, the VE stated that none of the jobs would be precluded. (*Id.*). In response to Nettles-Pierce's attorney's question as to whether any of the jobs would be precluded if the person needed to use a cane fifty percent of the time, the VE responded that all of the jobs would be precluded, because all of the jobs require a person to use both hands and stand for a significant portion of the work day. (R. 276).

The VE's overall opinion as to vocational outlook, if the judge fully credited all of the testimony at the hearing, is that Nettles-Pierce could not work. (R. 274). The VE testified that the primary reason for this is the fact that Nettles-Pierce has not had a job that lasted longer than three months and that emotional problems did not permit her to keep working. (Id.). Nettles-Pierce also required supervisory time greater than would be accepted in the workplace and her need to lay down frequently would interfere with typical work hours. (Id.).

## E.    Appeals Council Evidence

On March 31, 2005, Nettles-Pierce submitted additional evidence, including treatment records from visits with George DePhillips, M.D., dated July 7, 2004 through March 21, 2005 and X-rays taken on February 4, 2005. (279-290).

At the initial evaluation with Dr. DePhillips on July 7, 2004, Nettles-Pierce reported low back pain radiating into both lower extremities, though the majority of her pain was in the lower back. (R. 279, 284). She stated that she had experienced lower back pain for several years and that it had progressively worsened. (R. 284). Dr. DePhillips reviewed her MRI and lumbar spine scan and opined that she had moderate spinal stenosis at the L4-L5 level and degenerative disease with facet arthropathy. (*Id.*). He ordered a lumbar

epidural steroid injection and told Nettles-Pierce to return in two to three weeks for a follow-up. (Id.).  At the follow-up evaluation on October 18, 2004, Nettles-Pierce continued to complain of low back pain as well as bilateral leg pain. (R. 283).  Nettles-Pierce reported that she went to a pain clinic to receive an epidural steroid injection, but the injection was unsuccessful.  (*Id.*).  She stated that she would try again with a different anesthesiologist. (*Id.*).  Dr. DePhillips concluded that if Nettles-Pierce's condition did not improve, he would consider a lumbar discogram.  (*Id.*).

Nettles-Pierce saw Dr. DePhillips again on January 26, 2005.  (*Id.*).  Dr. DePhillips reported that Nettles-Pierce "could no longer live with her pain." (*Id.*).  Nettles-Pierce decided to undergo a lumbar discogram L3-S1. (*Id.*).  Dr. DePhillips explained that her only option surgically is a spinal fusion, if the discogram provokes concordant pain at the L4-L5 and L5-S1 levels. (*Id.*).   He also refilled her prescription for Vicodin ES.  (Id.).

On February 24, 2005, Nettles-Pierce had a lumbar discogram.  (R. 287). Following the discogram, x-rays were obtained at L-3/L-4, L-4/L-5 and at L-5/S-1.  (R. 285).  The x-rays revealed degenerative disc disease with abnormal spreading of contrast throughout the disc space at L-4/L-5. (*Id.*).  There was at least a moderate to possibly moderately severe degree of central stenosis with mild to moderate bilateral stenosis due to combination of generalized disc bulge as well arthritic changes posteriority. (*Id.*).  She was diagnosed with back pain and lumbar degenerative disc disease. (*Id.*).

Nettles-Pierce returned on March 21, 2005 for a follow-up examination. (283).  She reported that her discogram provoked concordant pain at the L3-L4 and L4-L5 levels and that they were unable to inject the L5-S1 level due to her experiencing significant pain during needle placement.  (*Id.*).   Dr. DePhillips explained that he would not recommend

a 3 level fusion, which would cause her to lose mobility, but the likelihood of getting pain relief would be very low.  (*Id.*).  Dr. DePhillips ordered Nettles-Pierce to return in four to six weeks for a follow-up.  (*Id.*).  However, the record does not indicate that Nettles-Pierce returned for a follow-up visit.  (*Id.*).

**LEGAL ANALYSIS**

**I.    Standard of Review**

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Charter,* 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 28 L. Ed. 2d 842, 91 S. Ct. 1420 (1971)).  We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2003)).  We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.*  While the ALJ "must build an accurate and logical bridge from the evidence to his conclusions," he need not discuss every piece of evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001).  The ALJ must "sufficiently articulate [his] assessment of the evidence to 'assure us that the ALJ considered the important evidence...[and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985)).

## II.  Legal Analysis Under the Social Security Act

A person is disabled under the Social Security Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176.  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski v. Halter,* 245 F.3d 881, 885-86 (7th Cir. 2001).  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

The ALJ followed this five-step inquiry.  At step one, the ALJ found that Nettles-Pierce had not engaged in substantial gainful activity since her alleged onset of disability. (R. 20, 22). At step two, the ALJ found that claimant has an impairment considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b). (*Id.*).  At step three, the ALJ determined that Nettles-Pierce's impairments do not "establish impairments, even in combination, that meet or equal the severity of any impairment listed in Appendix 1, Subpart P, Regulations No.4." (Id.).  At step four, the ALJ determined that Nettles-Pierce did not have any past relevant work. (R. 21, 22).  At step five, ALJ Mondi concluded that,

in consideration of Nettles-Pierce's age, education, work experience, and residual functional capacity, she is capable of making a successful adjustment to work that exists in significant numbers in the national economy.  (R. 22).  Therefore, the ALJ found that Nettles-Pierce is "not disabled" under the Act, and denied Nettles-Pierce's application. *(Id.)*.

Nettles-Pierce argues that the ALJ erred in his step five analysis because: (1) the ALJ erred in his conclusions as to Nettles-Pierce's psychological limitations and in basing his decision on a response to a hypothetical question that did not include all of her psychological limitations; and (2) the ALJ's finding that Nettles-Pierce had no physical limitations is not supported by substantial evidence.[6]  Nettles-Pierce also contends that remand is required due to new and material evidence showing significant physical limitations.

III.    **The ALJ's Mental Residual Functional Capacity ("RFC") Determination Is Not Supported By Substantial Evidence**

The ALJ found that Nettles-Pierce's mental impairments result in "moderate limitations in activities of daily living and social functioning, and mild difficulty with concentration, persistence and pace, with one or two episodes of decompensation, [and] her mental impairment results in moderate limitations in her abilities to carry out detailed instructions and to interact appropriately with the general public."  (R. 20).  However, the ALJ concluded that her "mental impairment is not so severe as to warrant limitations beyond those identified in the established residual functional capacity."  (R.21).

Nettles-Pierce argues that the ALJ's mental RFC is not supported by substantial evidence because: a) the ALJ erred in relying primarily on the opinions of the state agency

_____

[6]The ALJ's findings with respect to steps one through four are not contested.

doctors who did not examine Nettles-Pierce and based their opinions on part, rather than

on all of the evidence; b) the ALJ erred in failing to discuss the inconsistency between the

record reviewers' conclusion that Nettles-Pierce had few limitations and their own

conclusion that she had moderate limitations in activities of daily living, as well as other

evidence in the case; c) the ALJ erroneously did not discuss conclusions of mental health

professionals who examined or treated Nettles-Pierce as to the impact of her impairments;

d) the ALJ erroneously considered only part of the treatment evidence, specifically that

which favored his conclusion, rather than the treatment evidence as a whole; and e) the

ALJ did not discuss Nettles-Pierce's credibility in the context of records from mental health

professionals that were consistent with her credibility.

### A.     The ALJ Failed to Adequately Explain Why He Gave the Opinions of State Agency Physicians Controlling Weight And Did Not Properly Evaluate the Medical Opinions or Explain the Weight Given to Treating Source Opinions

Nettles-Pierce contends that the ALJ erred in relying primarily on the opinions of the

state agency doctors who did not examine her and did not properly evaluate the medical

opinions or explain the weight given to treating source opinions.   We agree.

Generally, the opinions of a treating physician who is familiar with the claimant's

impairments, treatments, and responses should be given great weight in disability

determinations.  *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).  Under the applicable

regulations, the ALJ is required to explain the weight given to the opinions of state agency

medical consultants or other program physicians, if the ALJ does not give the treating

physician controlling weight.  20 C.F.R. § 404.1527(f)(2)(ii).

Here, the ALJ conclusively stated that he "adopts the opinions of the consulting

physicians with the State Disability Determination Services." (R. 21). However, the ALJ erred because he never articulated his reason for giving their opinions controlling weight. (*Id.*). Dr. Brauer's mental status exam and Jungels' clinical assessment indicate more restrictive limitations than the consulting physicians' conclusions. Jungels assessed Nettles-Pierce's GAF as 48, indicating serious symptoms or serious difficulty in functioning, whereas the consulting physicians concluded that Nettles-Pierce had only moderate limitations. (R. 131, 147). Dr. Brauer's mental status examination revealed that, although Nettles-Pierce's judgment was within normal limits, "her self-reported history suggested that this judgment erodes in the presence of intense affect," but the consulting physicians do not mention any such limitation. (R. 116, 147).

Similarly, the ALJ did not explain why he did not give Dr. Chun's opinion controlling weight. Based on the mental status exam, Dr. Chun assessed Nettles-Pierce's GAF at 55, which is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning, but the consulting physicians concluded that Nettles-Pierce was only moderately limited in the ability to carry out detailed instruction and to interact appropriately with the general public. (R. 123, 147). The consulting physicians' opinions did not make any reference to Nettles-Pierce's occupational limitations. (R. 147).

Failure to provide good reasons for discrediting a treating physician's opinion is grounds for remand. *See Clifford v. Apfel,* 227 F.3d at 870. Accordingly, remand is appropriate. On remand the ALJ must clarify the weight given to each of the medical opinions in the record.

### B.  The ALJ Failed to Consider the Evidence In Its Entirety And Discuss Inconsistencies Among Medical Evidence

The ALJ erred when he did not discuss inconsistencies among medical evidence. The ALJ also erred when he considered only part of the treatment evidence rather than the treatment evidence as a whole. An ALJ is not required to address every piece of testimony and evidence. *Stephens v. Heckler,* 766 F.2d at 287. However, an ALJ may not select and discuss only that evidence which favors his ultimate conclusion, but must rationally articulate, at some minimum level, his analysis of the evidence. *Diaz,* 55 F.3d at 307; *Steele, 290* F.3d at 941. The ALJ is responsible for evaluating all of the medical opinions, determining the weight to give each opinion, and resolving any conflicts. *Diaz,* 55 F.3d at 306, n.2. Courts will not let the Commissioner's decision stand if it lacks evidentiary support or an adequate discussion of the issues. *See Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003).

An ALJ's RFC assessment must be based on *all* of the relevant evidence in the record, including, among other things, a claimant's medical history and medical signs and findings in addition to medical source statements. SSR 96-8p. Here, the ALJ failed to articulate and adequately discuss the reports and opinions of the treating and examining mental health professionals. The ALJ did not outline the medical evidence, including: the treating mental health professionals', Dr. Chun, M.D., and Jungels, medical records from examinations and therapy sessions; Jungels' clinical assessment; or the state examining psychologist's, Dr. Brauer, Ph.D., mental status exam. The ALJ also did not discuss Jungels' clinical assessment, which gave Nettles-Pierce a GAF of 48, indicating serious symptoms or serious difficulty in functioning.[7] The ALJ did not address Dr. Brauer's report,

---

[7]Under 20 C.F.R. 416.913(d), the ALJ may consider evidence from other sources to determine the severity of a claimant's impairments and how the impairments affect the

including Dr. Brauer's conclusion that Nettles-Pierce's judgment would deteriorate under stress. (R. 21-22).

The ALJ did mention Dr. Chun's assessment, but he did not discuss the inconsistency between Dr. Chun's assessment and his own RFC conclusion. (R. 21). The ALJ's mental RFC concluded that Nettles-Pierce's mental impairment results in moderate limitations in her abilities to carry out detailed instructions and to interact with the general public, but said nothing about her limitation in interacting with supervisors, despite her past work history and inability to maintain employment and Dr. Chun's conclusions that she has moderate limitations in occupational settings. *See Young v. Barnhart,* 362 F.3d 995, 1002 (7th Cir. 2004).

This is not an instance where the ALJ considered and specifically rejected portions of the evidence. *Diaz,* 55 F.3d at 306, n.2. Rather, the ALJ altogether failed to address the evidence that did not favor his conclusion. Accordingly, remand is appropriate on this issue.

### C. The ALJ's Credibility Determination is Not "Patently Wrong"

Nettles-Pierce contends that the ALJ erred in rejecting her credibility, because he did not discuss Nettles-Pierce's credibility in the context of records from mental health professionals that were consistent with her credibility. An ALJ must articulate the reasons behind credibility evaluations:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make conclusory statements that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible'...The determination or decision must contain

---

claimant's ability to work.

specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for the weight.

SSR 96-7p.

Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, their determinations are afforded special deference. *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). Thus, this Court will reverse an ALJ's credibility determination only if the claimant can show that it was "patently wrong." *Id.*

Nettles-Pierce contends that the ALJ's credibility determination is flawed, because he did not address most of Dr. Brauer's report, including Dr. Brauer's opinion that Nettles-Pierce's judgment would likely erode under intense affect. (R. 115-116). Nettles-Pierce notes that Dr. Brauer did not suggest any grounds for disbelieving her descriptions of her history to him. However, an ALJ is not required to address every piece of testimony and evidence. *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985). Moreover, a claimant cannot show that an ALJ's credibility finding is not supported by substantial evidence by merely pointing to omissions in the ALJ's decision. *Jens v. Barnhart,* 347 F.3d 209, 214 (7th Cir. 2003). Contrary to the Claimant's suggestion, the ALJ based his credibility determination on a number of facts and observations. The ALJ did not merely make "conclusory statements" but provided specific findings on credibility supported by evidence in the case record. The ALJ noted that while Nettles-Pierce alleges extreme exertional limitations since October 1, 2001, a medical report dated September 8, 2001 from Provena noted no neurological or musculoskeletal abnormality, and an x-ray report of her lower lumbar spine on March 26, 2002 noted only minor degenerative changes. (R. 20, 100-113,

214). Furthermore, the ALJ noted that there was evidence of inconsistencies in her subjective pain complaints and possible symptom magnification. (R. 21, 230-231). The ALJ also found that the Nettles-Pierce's failure to complete physical therapy was inconsistent with her complaints of severe pain. (R. 21). In addition, the ALJ went on to cite evidence from the record to support his finding that the Claimant's mental impairment was not so severe as to warrant limitations beyond those identified in the ALJ's mental RFC finding, and thus, the Claimant was not credible on that topic either. (R. 21-22, 114-16, 117-32, 194).

Because this Court finds that the facts and observations that the ALJ noted provide support for the ALJ's credibility determination, even if portions of the record, such as Dr. Brauer's report, support Nettles-Pierce's credibility, we cannot conclude that the ALJ's credibility determination was patently wrong. Accordingly, we will not remand on that basis.

### D. The ALJ's Hypothetical Did Not Reflect The Claimant's Impairments

Nettles-Pierce also argues that the ALJ's hypothetical question to the VE was inherently inaccurate because it did not include all her impairments as supported by the evidence.

In order for the ALJ to rely on the VE's testimony as substantial evidence, the hypothetical must reflect the claimant's impairments to the extent the ALJ finds them supported by the evidence in the record. *Sims v. Barnhart,* 309 F.3d 424, 432 (7th Cir. 2002) (quoting *Ehrhart v. Secretary of Health and Human Servs.,* 969 F.2d 534, 540 (7th Cir. 1992). It is important for the VE to understand the full extent of the applicant's disability so that the expert does not declare the applicant capable of undertaking work in the national or local economy that the applicant cannot truly perform. *Steele v. Barnhart,* 290

F.3d 936, 942 *(*7th Cir. *2002).* The hypothetical need not include every limitation provided that the vocational expert had the opportunity to learn of the applicant's limitations through, for example, an independent review of the medical records or through other questioning at the hearing. *Id.* Nevertheless, where the hypothetical does not include all of the applicant's limitations, we must have some amount of evidence in the record indicating that the vocational expert knew the extent of the applicant's limitations. *Id.*

In his opinion, the ALJ made an express finding that Nettles-Pierce has "mild difficulty with concentration, persistence, and pace" and that her mental impairment results in "moderate limitations in her ability to carry out detailed instructions and to interact appropriately with the general public." (R. 20). However, the hypothetical upon which the ALJ relies in concluding that substantial jobs exist for a person with Nettles-Pierce's impairments, did not take into account the ALJ's own observation in his opinion that Nettles-Pierce suffered from "mild difficulty with concentration, persistence, and pace." In fact, the question posed to the VE reflected only the ALJ's finding about Nettles-Pierce's mental RFC that she had moderate limitations in her ability to carry out detailed instructions as well as the ability to interact appropriately with the general public as well as an unlimited physical RFC. (R. 273).

Perhaps the ALJ thought that Nettles-Pierce could carry out detailed instructions in a way that would satisfy a potential employer, but it is equally possible that the VE might have found that there were not jobs for someone with moderate limitations in her ability to carry out detailed instructions and to interact with the general public and had mild difficulty with concentration, persistence, and pace. *See Kasarsky v. Barnhart,* 335 F.3d 539, 543 (7th Cir. 2003) (remanding an ALJ decision because the hypothetical question did not

account for claimant's deficiencies of concentration, persistence, and pace). The ALJ's failure to incorporate the latter kind of limitation in the hypothetical that he posed to the VE requires us to remand the case for further proceedings. *Id.* Moreover, because we also conclude, as discussed in detail in the next section, that the case must be remanded to determine the extent of Nettles-Pierce's physical impairments, upon remand, the ALJ's hypothetical must also include all impairments consistent with the claimant's *physical* impairment to the extent the ALJ finds the physical impairments supported by the evidence in the record.

## IV. The ALJ's Finding that Nettles-Pierce Had No Physical Limitations Is Not Supported By Substantial Evidence

Nettles-Pierce contends that the ALJ's finding that she had no physical limitations is not supported by substantial evidence. We agree.

In determining the claimant' physical impairments, the ALJ relied primarily on his credibility assessment of the claimant. The ALJ did reference the medical report from Provena, which noted no neurological or musculoskeletal abnormality, an x-ray of her lower lumbar spine noting only minor degenerative changes, and the physical therapist's observation that Nettles-Pierce was possibly magnifying her symptoms. (R. 20-21). The ALJ found Nettles-Pierce's allegations of extreme exertional limitations inconsistent with these medical findings and concluded that she is not credible. (*Id.*). However, he only discussed these medical findings in relation to Nettles-Pierce's credibility and not in a separate discussion assessing her physical impairments. (*Id.*).

An ALJ's RFC assessment must be based on *all* of the relevant evidence in the record, including, among other things, claimant's medical history and medical signs and

findings in addition to medical source statements. SSR 96-8p. The ALJ must consider all mental and physical impairments, even if they are not severe. SSR 96-8p. In assessing a claimant's residual functional capacity, courts will not let the Commissioner's decision stand if it lacks evidentiary support or an adequate discussion of the issues. *See Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003).

In this case, the ALJ did not discuss Nettles-Pierce's medical history and findings pertaining to her back problems. In making his finding that Nettles-Pierce was unlimited physically, the ALJ adopted the opinions of the consulting physicians with the State DDS. (R. 20). However, the consulting physicians only evaluated and reviewed Nettles-Pierce's mental impairments, not her physical impairments. The ALJ also failed to address Dr. Bender's evaluation and diagnosis of lumbar arthritis; Dr. Sullivan's diagnosis of chronic lower lumbar spine and lumbo-sacral mechanical dysfunction and subsequent treatment records; and the physical therapist's treatment records and observations of abnormalities in Nettles-Pierce's spine.[8] (R. 158, 180-181, 230-229). In short, it is unclear on what medical evidence and opinions the ALJ's decision is based. Thus, the ALJ failed to "build an accurate and logical bridge from the evidence to his conclusion" to allow us to trace the path of his reasoning. *Dixon v. Massanari*, 270 F.3d at 1176. In addition, the ALJ's decision did not comply with SSR 96-8p, because it must be based on *all* of the relevant evidence in the record, including, among other things, claimant's medical history and medical signs and finding. SSR 96-8p. Accordingly, the case must be remanded on this

---

[8]As mentioned above, under 20 C.F.R. 416.913(d), the ALJ may consider evidence from other sources to determine the severity of a claimant's impairments and how the impairments affect the claimant's ability to work.

basis.  Upon remand, the ALJ should consult a medical expert to ascertain what functional limitations, if any, the claimant's physical and mental conditions impose.  The ALJ must also address the medical history and findings pertaining to her purported back pain.

## V.    Nettles-Pierce's Motion for Remand

Nettles-Pierce contends that new evidence, specifically the records and report of Dr. DePhillips (R. 279-290), warrants remand pursuant to sentence six of 42 U.S.C. § 405(g).  To merit a remand pursuant to 42 U.S.C. § 405(g), a claimant must show that "there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g).

"'New' evidence is evidence 'not in existence or available to the claimant at the time of the administrative proceeding.'"  *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S. Ct. 2658, 110 L. Ed. 2d 563 (1990)).  Evidence is "material" if there is a "reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered."  *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997) (internal quotations omitted.)  A claimant shows "good cause" by demonstrating a "reasonable justification" for the failure to incorporate the evidence into the record before the administrative law judge.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

Here, Nettles-Pierce seeks to admit treatment records from July 2004 to March 2005,  which include February 2005 lumbar discography reports of her L3-4 and L4-L5 lumbar region, indicating lumbar degenerative disc disease and back pain.  (R.285-290).  Nettles-Pierce contends that because the treatment records and lumbar discography reports involve treatment after the ALJ's decision and were submitted at the earliest

possible opportunity, the evidence satisfies the requirements of new and good cause. She also contends that the evidence is material, because the absence of reports indicating back pain was a factor in the ALJ's decision to deny the claim. She argues that the additional evidence submitted demonstrates that, within a short time after the ALJ decision, a treating specialist concluded that her back problems imposed very significant functional limitations and documents the presence of objectively-shown abnormalities in the back.

The Seventh Circuit has held that medical records "postdating the hearing" and that "speak only to the [applicant's] current condition, not to her condition at the time of her application was under consideration by the Social Security Administration" do not meet the standard of new and material evidence. *Schmidt v. Barnhart,* 395 F.3d 737, 742 ( 7th Cir. 2005) (citing *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1989). In this case, Dr. DePhillips' treatment records and the February 2005 lumbar discography reports do no constitute "material" evidence for purposes of a potential remand pursuant to sentence six of 42 U.S.C. § 405(g), because they do not reflect Nettles-Pierce's condition at the time her application was under review. *Schmidt,* 395 F.3d at 742; *Chapman v. Barnhart,* 189 F. Supp. 2d 795, 805 (N.D. Ill. 2002).

Nettles-Pierce did not begin seeing Dr. DePhillips until July 7, 2004, nearly one year after the August 2003 administrative hearing, and the lumbar discography was performed eighteen months after the hearing. The medical records that document Nettles-Pierce's condition as it existed one year after the ALJ rendered his decision, while "new," do not constitute "material" evidence for purposes of a potential remand pursuant to 42 U.S.C. § 405(g). As previously mentioned, evidence is material only to the extent that it could have affected the outcome of the ALJ's decision. The medical records documenting Nettles-

Pierce's medical condition as it existed in 2004-05 could not have affected the bottom line of a decision rendered in November 2003. Dr. DePhillips noted that Nettles-Pierce's history of lower back pain progressively worsened. (R. 283). In addition, Nettles-Pierce filed a subsequent application for disability benefits on December 22, 2003, and the Appeals Council took action to ensure that the additional evidence is considered as part of that application. (R. 5). Because Nettles-Pierce failed to establish that the evidence is material, her motion for remand pursuant to sentence six of 42 U.S.C. § 405(g) is denied.

**CONCLUSION**

For the reasons set forth above, Nettles-Pierce's motion for summary judgment is granted in part and denied in part. The Commissioner's motion for summary judgment and Nettle-Pierce's motion for remand pursuant to sentence six of 42 U.S.C. §§ 405(g) are denied. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

**ENTER:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: September 20, 2007**